# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number:_____**

**Filing Date:  June 16, 2016**

**NO. S-1-SC-34287**

**HAMAATSA, INC.,**
**a New Mexico not-for-profit corporation,**

Plaintiff-Respondent,

v.

**PUEBLO OF SAN FELIPE,**
**a federally recognized Indian tribe,**

Defendant-Petitioner.

**ORIGINAL PROCEEDING ON CERTIORARI**
**John F. Davis, District Judge**

Samuel D. Gollis, Attorney at Law, P.C.
Samuel D. Gollis
Gwenellen P. Janov
Albuquerque, NM

for Petitioner

The Simons Firm, L.L.P.
Thomas A. Simons, IV
Faith Kalman Reyes
Santa Fe, NM

for Respondent

Navajo Nation Department of Justice
Paul Spruhan, Assistant Attorney General
Window Rock, AZ

for Amicus Curiae
Navajo Nation

Bergen Law Offices, L.L.C.
Leander Bergen
Albuquerque, NM

for Amicus Curiae
Ohkay Owingeh

Tammi M. Lambert
Laguna, NM

for Amicus Curiae
Pueblo of Laguna

VanAmberg, Rogers, Yepa, Abeita, Gomez & Works, LLP
Carolyn J. Abeita
Albuquerque, NM

for Amicus Curiae
Pueblo de San Ildefonso

Steffani A. Cochran, Chief General Counsel
Santa Fe, NM

for Amicus Curiae
Pueblo of Pojoaque

Leger Law & Strategy, LLC
Teresa Isabel Leger
Cynthia Kiersnowski
Santa Fe, NM

for Amicus Curiae
Pueblo of Santo Domingo


Maxine R. Velasquez, General Counsel
Santa Fe, NM

for Amicus Curiae
Pueblo of Tesuque


John D. Wheeler & Associates, P.C.
John D. Wheeler
Nelva Lena Cervantes
Arslanbek Sanjarovich Umarov
Alamogordo, NM

for Amicus Curiae
Mescalero Apache Tribe


Rothstein, Donatelli, Hughes, Dahlstrom, Schoenburg & Bienvenu, L.L.P.
Richard Warren Hughes
Santa Fe, NM

for Amicus Curiae
Picuris Pueblo


Miller Stratvert, P.A.
Richard L. Alvidrez

Albuquerque, NM

for Amicus Curiae
New Mexico Land Title Association

**OPINION**

**VIGIL, Justice.**

**I. INTRODUCTION**

{1} The Pueblo of San Felipe (Pueblo) appeals from an opinion of the New Mexico Court of Appeals declining to extend the Pueblo, an Indian tribe, immunity from suit. Because it is settled federal law that sovereign Indian tribes enjoy immunity from suit in state and federal court—absent waiver or abrogation by Congress—we reverse the Court of Appeals with instructions for the district court to dismiss the suit for lack of subject matter jurisdiction.

**II. BACKGROUND**

{2} Hamaatsa, Inc. (Hamaatsa) is a non-profit New Mexico corporation that owns land in Sandoval County. Adjacent to Hamaatsa's property is land owned in fee by the Pueblo, a federally recognized Indian tribe organized under the Indian Reorganization Act, 25 U.S.C. § 476 (2012). The Bureau of Land Management (BLM) conveyed to the Pueblo, in fee simple, the land at issue on December 13, 2001. The property, albeit adjacent and contiguous with reservation land, is not yet held in trust by the federal government as part of the Pueblo's reservation. The United States Department of the Interior, Bureau of Indian Affairs (BIA), awaits resolution of the instant dispute prior to taking the fee-simple parcel into trust. *Hamaatsa, Inc.*

*v. Pueblo of San Felipe*, 2013-NMCA-094, ¶ 11, n.3, 310 P.3d 631, *cert. granted*, 2013-NMCERT-009 (No. 34,287, Sept. 20, 2013) (citing *Hamaatsa, Inc. v. Sw. Reg'l Dir.*, 55 IBIA 132, 132-33 (2012)).

{3}     In its 2001 conveyance to the Pueblo, "the BLM reserved 'an easement and right-of-way over, across, and upon a strip of land 40 feet wide along the existing road . . . identified in NMNM 95818, for the full use as a road by the United States for public purposes.' " Such roads are variously called "932 Roads" or "R.S. 2477 Roads,"[1] and throughout this opinion we refer to the NMNM 95818 easement as "Northern R.S. 2477." On September 19, 2002, the BLM purported to quitclaim its interest in the Northern R.S. 2477 to the Pueblo. Access to Northern R.S. 2477 forms the basis of Hamaatsa's December 30, 2010, complaint against the Pueblo.

{4}     Hamaatsa uses Northern R.S. 2477 on the Pueblo's property to access its land. In August 2009 Hamaatsa received a letter from the then Governor of the Pueblo stating that Hamaatsa had no legal right of access across the Pueblo's property and that Hamaatsa's use of Northern R.S. 2477 was a trespass. Hamaatsa continued to use the road and filed suit requesting that the district court declare that the Pueblo cannot

---

[1]Referencing a statutory mechanism for creating public roads, Rev. Stat. 2477, Act of July 26, 1866, ch. 262, § 8, 14 Stat. 251, 253 (1866) (codified at 43 U.S.C. § 932), *repealed by* Federal Land Policy and Management Act of 1976, Pub. L. No. 94-579, § 706(a), 90 Stat. 2743, 2793 [hereinafter R.S. 2477].

so restrict Hamaatsa's use of the road.

{5} Specifically, Hamaatsa's complaint alleges that the land over which Northern R.S. 2477 traversed was owned by the BLM since at least 1906 and the road was constructed and used by the public from at least 1935 until the date of Hamaatsa's complaint. Further, Northern R.S. 2477 was used by Hamaatsa and its predecessors in interest to access its property, and has been a public road that vested in the public as a state highway under R.S. 2477 when it was not retained by the United States since at least 1935. Given the aforementioned quitclaim deed, the Pueblo argues that there is no public road across its property that Hamaatsa may lawfully access. The Pueblo further claims that Northern R.S. 2477 is but one point of access to Hamaatsa's property.

{6} The Pueblo filed a motion to dismiss Hamaatsa's complaint pursuant to Rule 1-012(B)(1) NMRA, asserting that its sovereign immunity deprived the district court of subject matter jurisdiction. After a hearing on the motion to dismiss the district court denied the Pueblo's motion, reasoning that the action was an *in rem* proceeding not seeking damages, to which sovereign immunity was no bar. The district court granted the Pueblo leave to seek an interlocutory appeal which was then granted by the Court of Appeals on July 5, 2011. The district court stayed all proceedings

3

pending resolution of the appeal.

{7} By a July 23, 2013, opinion the Court of Appeals affirmed the district court. *Hamaatsa,* 2013-NMCA-094, ¶ 1. Though, seeing "no reason to address the issue of in rem versus in personam," the majority refused to recognize tribal sovereign immunity for different reasons. *Id.* ¶ 10. It instead focused on the fact that "the Pueblo offered no evidence of any property or governance interests whatsoever in the road or that the road, concededly a state public road, would threaten or otherwise affect its sovereignty." *Id.* ¶ 11. Noting further that the Pueblo did not present any proof that "a district court's declaration . . . [that the road is public] would in any way undermine the Pueblo's sovereignty or sovereign authority, infringe on any right of the Pueblo to govern itself or control its internal relations, or otherwise adversely affect its governmental, property, or treasury interests," *id.*, the Court of Appeals held that without such evidence there was "no justifiable basis on which the Pueblo can draw immunity from inherent sovereignty," *id.* ¶ 13.

{8} The Court of Appeals additionally held that "the issue in this case is a matter of state law, over which the district court has jurisdiction," *id.* ¶ 14, based on the fact that " '[w]hether an easement—a public road at that—exists across land held in fee simple is clearly an issue of state law,' " *id.* ¶ 14 (quoting *Jicarilla Apache Tribe v.*

4

*Bd. of Cty. Comm'rs*, 1994-NMSC-104, ¶¶ 10-19, 118 N.M. 550, 883 P.2d 136) (alteration in original). The opinion reasoned that "to permit a sovereign immunity bar at this facial attack [Rule 1-012(B)] stage of the proceedings would mean that, based on nothing more than the bare assertion of sovereign immunity," a pueblo could acquire land anywhere in New Mexico, subject to a public road, and "immediately deny the motoring public and all neighboring property owners access." *Id*. ¶ 16. The Court of Appeals went on to cite several United States Supreme Court cases it claimed imply that tribes should no longer be protected by sovereign immunity, including *Oklahoma Tax Commission v. Citizen Band Potawatomi Indian Tribe of Oklahoma* (*Potawatomi I*), 498 U.S. 505, 514 (1991) (Stevens, J., concurring) (stating that the "doctrine of sovereign immunity is founded upon an anachronistic fiction"), and *Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc.*, 523 U.S. 751, 757-58 (1998) (providing that "[t]he rationale . . . [for sovereign immunity] can be challenged as inapposite to modern, wide-ranging tribal enterprises extending well beyond traditional tribal customs and activities"). *Hamaatsa*, 2013-NMCA-094, ¶¶ 17-19. Ultimately, the majority of the Court of Appeals panel concluded that *Kiowa* "read fully, should stimulate analysts to reasonably view the case now before this Court as one beyond the periphery of

immunity, requiring affirmance of the district court's denial of the Pueblo's motion to dismiss." *Hamaatsa*, 2013-NMCA-094, ¶ 19. The Court of Appeals did just that, affirming the district court's denial of the Pueblo's motion to dismiss. *Id.* ¶ 22.

{9}	A dissenting view opined that the Pueblo's motion to dismiss should have been granted based on sovereign immunity. *Id.* ¶ 24 (Wechsler, J., dissenting). Apart from its analysis of the merits, the dissent disagreed with the majority's "discussion of: (1) *Kiowa* . . ., (2) cases that do not involve tribal sovereign immunity, (3) the equities of the case, and (4) the timing of the Pueblo's motion." *Hamaatsa*, 2013-NMCA-094, ¶ 25 (Wechsler, J., dissenting).

{10}	The dissent first noted that "tribal sovereign immunity is a matter of federal law and is not subject to diminution by the state." *Id.* ¶ 26 (Wechsler, J., dissenting) (citation omitted). It acknowledged that "there are issues concerning the scope of tribal sovereign immunity when tribes . . . engage in activities that extend beyond the original purpose of the doctrine to safeguard tribal self-governance." *Id.* ¶ 27 (Wechsler, J., dissenting) (citation omitted). However, while the United States Supreme Court in *Kiowa* noted its misgivings toward the doctrine, the dissent noted that *Kiowa* nonetheless applied sovereign immunity. *Hamaatsa*, 2013-NMCA-094, ¶ 27 (Wechsler, J., dissenting) (citing *Kiowa*, 523 U.S. at 756-60). And, because

*Kiowa* applied sovereign immunity for tribal activity occurring off-reservation, much like the activity at issue in the instant case, the dissent determined that the Court of Appeals was "not in a position to act differently." *Hamaatsa*, 2013-NMCA-094, ¶ 27 (Wechsler, J., dissenting).

{11}    Next, the dissent disagreed with the majority's application of cases involving tribal sovereign authority, as distinguished from tribal sovereign immunity. *Id*. ¶¶ 28-29 (Wechsler, J., dissenting). It highlighted that "[t]here is a difference between the right to demand compliance with state laws and the means available to enforce them." *Id*. ¶ 29 (Wechsler, J., dissenting) (quoting *Kiowa*, 523 U.S. at 755). Thus, "cases involving a tribe bringing suit to preclude a municipality from imposing taxes or other local laws 'do not explore the boundaries of a tribe's *sovereign immunity* from suit[, and r]ather, they explore a tribe's *sovereign authority* over purchased lands.' " *Hamaatsa*, 2013-NMCA-094, ¶ 29 (Wechsler, J., dissenting) (alteration in original) (quoting *Armijo v. Pueblo of Laguna*, 2011-NMCA-006, ¶ 18, 149 N.M. 234, 247 P.3d 1119).

{12}    Third, the dissent pointed out that " 'sovereign immunity is not a discretionary doctrine that may be applied as a remedy depending on the equities of a given situation[, and,] it presents a pure jurisdictional question.' " *Id.* ¶ 30 (Wechsler, J.,

dissenting) (alteration in original) (quoting *Armijo*, 2011-NMCA-006, ¶ 13). Although the dissent agreed that Hamaatsa presented a strong equitable argument, it reiterated that this argument "is not relevant to the jurisdictional question before us." *Hamaatsa*, 2013-NMCA-094, ¶ 30 (Wechsler, J., dissenting).

{13} Fourth, the dissent asserted that the timing of the Pueblo's assertion of sovereign immunity in its motion to dismiss is irrelevant. *Id*. ¶ 31 (Wechsler, J., dissenting). It noted that "an assertion that tribal sovereign immunity requires dismissal of a lawsuit is generally raised in a [Rule 1-012(B)(1)] motion," and that "[a] motion under Rule 1-012(B) shall be made before pleading if a further pleading is permitted." *Hamaatsa*, 2013-NMCA-094, ¶ 31 (Wechsler, J., dissenting) (internal quotation marks and citations omitted). It therefore concluded that "the Pueblo's motion was properly before the district court." *Id*. (Wechsler, J., dissenting).

{14} Next, the dissent reached the merits of the Pueblo's motion. *Id*. ¶ 32 (Wechsler, J., dissenting). Analyzing the merits in the terms the district court used in denying the Pueblo's motion, the dissent concluded that the complaint presented an *in rem* proceeding under its modern definition, being an action directed "not *against* the property per se, but rather at resolving the interests, claims, titles, and rights in that propert[y, a]nd it is persons—as individuals, governments, corporations—who

8

possess those interests." *Id.* ¶ 34 (Wechsler, J., dissenting) (quoting *State v. Nunez*, 2000-NMSC-013, ¶ 78, 129 N.M. 63, 2 P.3d 264) (internal quotation marks omitted). Unlike the district court, the dissent concluded that the Pueblo was protected by sovereign immunity because "the doctrine of sovereign tribal immunity applies to an in rem proceeding involving tribally owned property." *Hamaatsa*, 2013-NMCA-094, ¶ 44 (Wechsler, J., dissenting); *see also Oneida Indian Nation of N.Y. v. Madison Cty.* (*Oneida I*), 401 F. Supp. 2d 219, 229 (N.D.N.Y. 2005) ("It is of no moment that the . . . suit at issue here is *in rem* . . . [w]hat is relevant is that the [c]ounty is attempting to bring suit against the tribe."), *aff'd by* 605 F.3d 149 (2d Cir. 2010) (*Oneida II*), *vacated and remanded on other grounds by Madison Cty., N.Y. v. Oneida Indian Nation of N.Y.* (*Oneida III*), 562 U.S. 42 (2011) (per curiam).

{15}    Finally, the Court of Appeals' dissent asserted that the Pueblo should enjoy sovereign immunity regardless of the type of relief requested by the complaint, be it monetary, declaratory, or injunctive. *Hamaatsa*, 2013-NMCA-094, ¶ 51 (Wechsler, J., dissenting) ("[T]ribal sovereign immunity applies to actions for declaratory and injunctive relief to the same extent that it applies to an action for damages." (citations omitted)). The dissent concluded that the district court should have granted the Pueblo's motion to dismiss based on its sovereign immunity. *Id.* ¶ 56 (Wechsler, J.,

9

dissenting).

{16}    The Pueblo petitioned this Court for a writ of certiorari. We granted certiorari to resolve whether the Pueblo is immune from Hamaatsa's suit as a sovereign tribal nation, whether the Court of Appeals incorrectly relied on considerations of equity and fairness in considering the Pueblo's immunity from suit, and whether the Court of Appeals misapplied Rule 1-012(B) with respect to the Pueblo's motion to dismiss on sovereign immunity grounds. In this opinion, then, we address first whether the Pueblo is entitled to sovereign immunity from suit; second, whether considerations of equity in light of the nature of a claim should override that protection, requiring us to clarify the distinction between sovereign authority and sovereign immunity; and last, whether a motion to dismiss at this stage of the proceedings is the proper means for asserting the defense of sovereign immunity. For the reasons that follow, we hold that under federal law the Pueblo is immune from suit, absent a waiver of its immunity or congressional authorization of the suit—regardless of the nature of the claim giving rise to the dispute—and can assert its immunity by a Rule 1-012(B)(1) motion to dismiss. We vacate the opinion of the Court of Appeals and remand the case to the district court for dismissal of the Pueblo from Hamaatsa's suit in accordance with this opinion.

## III. STANDARD OF REVIEW

{17} "In reviewing an appeal from an order granting or denying a motion to dismiss for lack of jurisdiction, the determination of whether jurisdiction exists is a question of law which an appellate court reviews de novo." *Gallegos v. Pueblo of Tesuque*, 2002-NMSC-012, ¶ 6, 132 N.M. 207, 46 P.3d 668 (citations omitted); *see also Martinez v. Cities of Gold Casino*, 2009-NMCA-087, ¶ 22, 146 N.M. 735, 215 P.3d 44 ("We review de novo the legal question of whether an Indian tribe . . . possesses sovereign immunity."), *cert. denied*, 2009-NMCERT-007 (No. 31,757, Jul. 15, 2009) (citation omitted).

## IV. DISCUSSION

### A. Indian Tribes Are Subject to Suit Only Where the Tribe Waives Its Immunity or Congress Explicitly Authorizes Suit

{18} Before discussing whether the Pueblo was entitled to immunity from this lawsuit, it is important to highlight the historical context from which the doctrine of tribal sovereign immunity arose. "Long before the formation of the United States, [t]ribes 'were self-governing sovereign political communities.' " *Michigan v. Bay Mills Indian Cmty.* (*Bay Mills*), ___ U.S. ___, 134 S. Ct. 2024, 2040 (2014) (Sotomayor, J., concurring) (quoting *United States v. Wheeler*, 435 U.S. 313, 322-23 (1978)). It is a long held principle that any sovereign has the power to determine the

11

jurisdiction of its own courts, and when it comes to the jurisdiction over a sovereign in a second sovereign's courts, it is generally the law of the second sovereign that governs. *See Kiowa*, 523 U.S. at 760-61 (Stevens, J., dissenting). And, because the tribes were not a party to the Constitutional Convention at which sovereign States mutually ceded aspects of their sovereignty in becoming the United States, the United States Supreme Court has held firm to the canon that tribes thus retain their sovereignty in a fashion distinct from that of the States. *See, e.g.*, *Blatchford v. Native Village of Noatak*, 501 U.S. 775, 782 (1991) (explaining that at the Constitutional Convention there was a "surrender of immunity from suit by sister States," and that "it would be absurd to suggest that the tribes [similarly] surrendered immunity in a convention to which they were not even parties" (citation omitted)). In recognition of as much, tribes retain most of their sovereign powers as is consistent with the controlling federal law, which is generally intended to serve the purpose of promoting tribal economic development and self-sufficiency. *See Kiowa*, 523 U.S. at 757.

{19}     Thus, we must acknowledge that "Indian tribes are 'domestic dependent nations' that exercise 'inherent sovereign authority.' " *Bay Mills*, 134 S. Ct. at 2030 (quoting *Potawatomi I*, 498 U.S. at 509). They retain a unique status as "separate sovereigns pre-existing the Constitution." *Santa Clara Pueblo v. Martinez*, 436 U.S.

12

49, 56 (1978). Yet, as domestic dependent nations, tribes are subject to plenary control by Congress. *Id*. (citations omitted); *see also United States v. Lara*, 541 U.S. 193, 200 (2004) (explaining that commerce and treaty clauses, and structure of Constitution, are basis for "plenary and exclusive" power of Congress); *see generally* F. Cohen, Handbook of Federal Indian Law § 5.01, pp. 383-91 (2012). "Thus, unless and until Congress acts, the tribes retain their historic sovereign authority." *Bay Mills*, 134 S. Ct. at 2030 (internal quotation marks and citation omitted).

{20}     One aspect of traditional sovereignty—thereby retained by tribes, and subject only to congressional abrogation—is common-law immunity from suit. *Santa Clara Pueblo*, 436 U.S. at 58 ("[W]ithout congressional authorization, the Indian nations are exempt from suit." (internal quotation marks and citation omitted)). That immunity, as the United States Supreme Court explained, is "a necessary corollary to Indian sovereignty and self-governance." *Three Affiliated Tribes of Fort Berthold Reservation v. Wold Eng'g*, 476 U.S. 877, 890 (1986). In light of its import, a tribe's immunity—as a corollary of its sovereignty—can only be qualified by express congressional mandate or waiver. *Bay Mills*, 134 S. Ct. at 2030-31.

{21}     Tribal sovereign immunity is the maxim, subject only to the power of a tribe to waive the immunity or Congress's plenary power to regulate the tribes. *Id.*; *Kiowa*,

13

523 U.S. at 759-60. As a matter of federal law, then, the doctrine of sovereign immunity is protected from an individual state's attempt to abridge or redefine its scope. *Kiowa*, 523 U.S. at 756 ("So tribal immunity is a matter of federal law and is not subject to diminution by the States." (citations omitted)); *Pueblo of Tesuque*, 2002-NMSC-012, ¶ 7.

{22}     As stated, the unequivocal precedent of the United States Supreme Court declares only two exceptions to tribal sovereign immunity—the tribes's waiver of immunity or congressional authorization—neither of which exists in the instant case. The Pueblo has chosen not to waive its immunity and affirmatively invokes it as a shield from Hamaatsa's claim. Nor has Congress authorized this type of suit against the Pueblo. Thus, we hold firm to existing federal precedent granting the Pueblo, as a sovereign Indian tribe, immunity from Hamaatsa's suit in state court.

{23}     We do pause to note, though, that in some circumstances tribal officers will not enjoy the same immunity from suit as does the tribe itself. *Santa Clara Pueblo*, 436 U.S. at 59 (citing *Ex parte Young*, 209 U.S. 123, 132 (1908)). Under *Ex Parte Young*, "[a] federal court is not barred by the Eleventh Amendment from enjoining state officers from acting unconstitutionally, either because their action is alleged to violate the Constitution directly or because it is contrary to a federal statute or regulation that

14

is the supreme law of the land." 17A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4232 (3d ed. 2007) (footnotes omitted). Tribal sovereign immunity is distinct from the Eleventh Amendment's protection of states, but the same rule applies with respect to state and tribal officers. *Vann v. Kempthorne*, 534 F.3d 741, 749 (D.C. Cir. 2008). Tribal officers are not immune from suit in federal court where a "complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md. Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002) (internal quotation marks and citation omitted).

{24} Although neither waiver nor congressional abrogation exists in the instant case, our analysis does not end here because Hamaatsa further urges this Court to recognize an exception to the doctrine of sovereign immunity in matters pertaining to the public's use and access to public roads located on fee-owned tribal lands without tribal interference. We refrain from carving out such a novel exception because the immunity enjoyed by tribes under federal law is not subject to such diminution. While we reject Hamaatsa's request, we consider it prudent to address the equitable and procedural arguments raised by the parties, as well as the approach taken on these issues by the district court and the majority and dissenting opinions of the Court of

Appeals.

**B.      Proposed Exceptions to the Pueblo's Sovereign Immunity From Suit**

{25}      Hamaatsa asks this Court to deny the Pueblo's right to sovereign immunity on equitable grounds, stemming from the unfairness that could result from the Pueblo's interference with the public's use of Northern R.S. 2477. Hamaatsa makes these arguments under the premise that its action lies *in rem* as opposed to *in personam*, and that it seeks declaratory relief against the Pueblo, opposed to monetary damages. Courts time and again have sought to alleviate similar claims of inequity resulting from the imposition of sovereign immunity, particularly given the modern increase in tribal land ownership and involvement in the commercial economy. *See, e.g.*, *Hamaatsa*, 2013-NMCA-094, ¶ 19. Such equitable considerations in fact formed the impetus of the Court of Appeals' rationale in denying the Pueblo immunity in state court. But, in doing so, it improperly conflated two interrelated but distinct doctrines—tribal sovereign authority and sovereign immunity. Because unequivocal federal precedent establishes otherwise, it is incumbent upon this Court to first clarify the important distinctions between those two doctrines.

**i.      Sovereign Authority**

{26}      Tribal sovereign authority and tribal sovereign immunity are distinct doctrines

16

with different origins and purposes. *Oneida II*, 605 F.3d at 156, *vacated and remanded*, 562 U.S. 42 (2011). Tribal sovereign authority concerns the extent to which a tribe may exercise jurisdictional authority over lands the tribe owns to the exclusion of state jurisdiction. *See id.* Generally, a state has the authority to tax or regulate—i.e., apply state substantive law to—tribal activities occurring within the state and outside reservation lands, as well as to tax or regulate nonmembers activity on Indian fee-owned and reservation lands. *Kiowa*, 523 U.S. at 755 ("We have recognized that a State may have authority to tax or regulate tribal activities occurring within the State but outside Indian country."); *Potawatomi I*, 498 U.S. at 515 (holding that Oklahoma may tax cigarette sales by a tribe's store to nonmembers.). And, conversely, a tribe—as a unique entity possessing attributes of sovereignty over both its members and territory—may regulate its own members, and its fee-owned and reservation lands, to the extent necessary to protect tribal self-government and internal relations. *Montana v. United States*, 450 U.S. 544, 564 (1981) ("Thus, in addition to the power to punish tribal offenders, the Indian tribes retain their inherent power to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members. But exercise of tribal power beyond what is necessary to protect tribal self-government or to control

17

internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation." (citations omitted)). Thus, tribal sovereign authority, the power of a tribe to exert what is necessary to protect self-governance and establish relations amongst its members to the exclusion of state regulation, is inherently distinct from the notion of tribal sovereign immunity—the plenary right to be free from having to answer a suit. As stated by the United States Supreme Court in *Kiowa*, "[t]here is a difference between the right to demand compliance with state laws and the means available to enforce them." 523 U.S. at 755 (citation omitted). That is, just because a state may, for example, tax cigarette sales by a tribe's store to nonmembers, such authority to tax or regulate has no bearing on the tribe's ultimate immunity from a suit to collect unpaid state taxes. *See Potawatomi I*, 498 U.S. at 512-14.

{27}     By excepting the Pueblo from the protections of sovereign immunity the Court of Appeals majority conflated the distinct doctrines of sovereign authority and sovereign immunity. *See Hamaatsa*, 2013-NMCA-094, ¶ 14 (discussing cases regarding tribal power to regulate in the context of its analysis of tribal sovereign immunity). In so doing, it supports its reasoning that the Pueblo was not immune from jurisdiction in the district court by citation to case law that instead concerns an Indian

18

tribe's regulatory and adjudicatory jurisdiction over both its fee-owned and reservation land. *See id.* Its conclusion—essentially that an Indian tribe cannot exercise jurisdiction over conduct on a public roadway crossing land owned in fee by the tribe, and thus the tribe cannot be immune from relevant suit—is at odds with aforementioned controlling federal precedent. "To say substantive state laws apply to off-reservation conduct . . . is not to say that a tribe no longer enjoys immunity from suit." *Kiowa*, 523 U.S. at 755. Thus, when it comes to the Pueblo's immunity from the instant suit, *Kiowa* and its progeny control. We now turn to Hamaatsa's remaining arguments, which we reject, because they in part rely upon that improper conflation of sovereign authority and immunity.

**ii.    *In Rem***

{28}    Hamaatsa argued in the district court, as it does now, that due to the *in rem* nature of these proceedings the Pueblo may not invoke its sovereign immunity. The district court denied the Pueblo's motion to dismiss based in part on that argument. However, in the context of tribal sovereign immunity there exists no meaningful distinction between *in rem* and *in personam* claims. We hold that regardless of whether Hamaatsa asserts claims that lie *in rem* or *in personam*, its action against the Pueblo is barred in accordance with federal law. Because tribal sovereign immunity

19

divests a court of subject matter jurisdiction it does not matter whether Hamaatsa's claim is asserted *in rem* or *in personam*. *See Miner Elec., Inc. v. Muscogee (Creek) Nation*, 505 F.3d 1007, 1009 (10th Cir. 2007) ("Tribal sovereign immunity is a matter of subject matter jurisdiction . . . ." (internal quotation marks and citation omitted)).

{29} Hamaatsa primarily relies on the United States Supreme Court's holding, in *County of Yakima v. Confederated Tribes and Bands of the Yakima Indian Nation* (*Yakima*), that the county had authority to tax land owned in fee by the tribe because the county's jurisdiction is "*in rem* rather than *in personam*." 502 U.S. 251, 265 (1992). That case, though, concerned the county's authority "to tax certain 'fee patent' parcels of land, located within the Yakima Reservation"—and not, as Hamaatsa argues, the tribe's amenability to suit in court based on a concept of an *in rem* exception to immunity. *See Cayuga Indian Nation of N.Y. v. Seneca Cty., N.Y.* (*Cayuga*), 890 F. Supp. 2d 240, 247-48 (W.D.N.Y. 2012), *aff'd*, 761 F.3d 218 (2d Cir. 2014). *Yakima*, involving a tribe's sovereign authority, does not govern the instant dispute.

{30} While, as Hamaatsa argues, some state courts have explicitly carved out exceptions to tribal sovereign immunity for *in rem* actions, *see Anderson & Middleton Lumber Co. v. Quinault Indian Nation*, 929 P.2d 379, 385 (Wash. 1996); *Cass Cty.*

*Joint Water Res. Dist. v. 1.43 Acres of Land in Highland Twp.*, 2002-ND-83, ¶ 20, we conclude the United States Supreme Court's opinion in *Bay Mills*—decided subsequent to all cases cited by Hamaatsa—unequivocally bars us from carving out a similar exception. In *Bay Mills* the United States Supreme Court held "we have time and again treated the 'doctrine of tribal immunity [as] settled law' and dismissed any suit against a tribe absent congressional authorization (or a waiver)." 134 S. Ct. at 2030-31 (alteration in original) (quoting *Kiowa*, 523 U.S. at 756). The Second Circuit, for example, understood this avowedly broad pronouncement to require it to refuse to draw novel exceptions to tribal sovereign immunity, such as a distinction between "*in rem* and *in personam* proceedings." *Cayuga*, 761 F.3d at 221 (citing *Bay Mills*, 134 S. Ct. at 2031; *The Siren*, 74 U.S. 152, 154 (1868) ("[T]here is no distinction between suits against the government directly, and suits against its property.")). We choose to follow the Second Circuit, and thereby refuse to recognize an exception to tribal sovereign immunity for *in rem* proceedings in light of the United States Supreme Court's holding in *Bay Mills*. And, since we hold that Hamaatsa's suit is nonetheless barred as a matter of federal law, we need not analyze whether the instant suit constitutes an *in rem* or *in personam* suit. *Contra Hamaatsa*, 2013-NMCA-094, ¶ 32 (Wechsler, J., dissenting).

21

### iii. Type of Relief

{31} The district court also denied the Pueblo's motion to dismiss in part because it found that tribal sovereign immunity was inapplicable to a complaint that did not seek monetary damages. Hamaatsa, pursuing declaratory relief, thus renews that argument here before this Court. We disagree, and instead hold that tribal sovereign immunity is a wholesale bar to suit against a tribe in New Mexico for any relief—be it monetary, declaratory, or injunctive. As a matter of federal law, suit being brought against an Indian tribe is the prerequisite for invocation of the doctrine. *See Bay Mills*, 134 S. Ct. at 2030-31. This conclusion is compatible with the majority of federal courts having occasion to consider this generally undisputed principle of tribal sovereign immunity. *See, e.g.*, *Santa Clara Pueblo*, 436 U.S. at 59 (discussing whether Santa Clara Pueblo had waived its immunity, and holding that "[n]othing on the face of Title I of the [Indian Civil Rights Act] purports to subject tribes to the jurisdiction of the federal courts in civil actions for *injunctive or declaratory relief*" (emphasis added)); *Wisconsin v. Ho-Chunk Nation*, 512 F.3d 921, 928 (7th Cir. 2008) ("Tribal sovereign immunity . . . extends to suits for injunctive or declaratory relief." (citation omitted)); *Citizen Band Potawatomi Indian Tribe of Okla. v. Okla. Tax Comm'n* (*Potawatomi II*), 969 F.2d 943, 948 (10th Cir. 1992) (holding the tribe

immune from injunctive relief action); *Imperial Granite Co. v. Pala Band of Mission Indians*, 940 F.2d 1269, 1271 (9th Cir. 1991) (noting that tribal immunity "extends to suits for declaratory and injunctive relief" (citation omitted)). The Court of Appeals, similarly, has applied tribal sovereign immunity as a bar in suits seeking non-monetary relief. *Armijo*, 2011-NMCA-006, ¶¶ 1, 5 (holding that the Pueblo of Laguna's immunity from suit barred Armijo's actions against it seeking declaratory relief to quiet title to land).

{32}     Hamaatsa still urges this Court to hold otherwise, against the weight of federal precedent. We decline to follow its alternative conclusion emanating from a line of cases from the Fifth Circuit holding that tribal sovereign immunity should be relegated to suits for monetary relief. *See Comstock Oil & Gas Inc. v. Ala. & Coushatta Indian Tribes of Tex.*, 261 F.3d 567, 572 (5th Cir. 2001) (holding that "the district court erroneously concluded that the [t]ribe was entitled to sovereign immunity against the oil companies' claims for equitable relief"); *TTEA v. Ysleta del Sur Pueblo*, 181 F.3d 676, 680-81 (5th Cir. 1999) (reasoning that "tribal immunity did not support [a district court's] order dismissing the actions seeking declaratory and injunctive relief"); *see also New York v. Shinnecock Indian Nation*, 523 F. Supp. 2d 185, 299 n.74 (E.D.N.Y. 2008) (following the Fifth Circuit and distinguishing

*Kiowa* by noting that it addressed sovereign immunity from damages actions and not from injunctive relief), *vacated on other grounds*, 686 F.3d 133 (2d Cir. 2012). We reject the rationale propounded by Hamaatsa and adopted in the Fifth Circuit because it is not in accordance with the weight of federal precedent. We consider the arguments made by Hamaatsa to be based upon inferences too tenuous to apply in the instant case and to further conflate the doctrines of sovereign authority and sovereign immunity.

{33}    In *TTEA* the Fifth Circuit concluded that since *Kiowa* involved a contracts action for money damages, its broad approval of the doctrine of tribal sovereign immunity in that case ought be relegated to its facts. 181 F.3d at 680-81. The Fifth Circuit relied on this logic once again in *Comstock Oil & Gas*, refusing to apply tribal sovereign immunity as a bar to actions brought for declaratory or injunctive relief. 261 F.3d at 572. We are unpersuaded. An exception to tribal sovereign immunity for equitable or declaratory relief cannot be squared with the more persuasive opinion in *Ute Distrib. Corp. v. Ute Indian Tribe*, 149 F.3d 1260 (10th Cir.1998). In that case the Tenth Circuit held that a plaintiff's "action [against a tribe] seeking a declaratory judgment that certain tribal water rights were not partitioned" was barred by sovereign immunity. *Id.* at 1262-65. The Tenth Circuit also discussed the tribe's

sovereign immunity from other claims made by the Ute Distribution Corporation (UDC), and held that an action by UDC against a tribe for equitable relief was barred by sovereign immunity. *Id*. The Tenth Circuit again rejected a plaintiff's argument to apply a non-monetary relief exception to tribal sovereign immunity in *In re Mayes*, 294 B.R. 145, 154-55 (B.A.P. 10th Cir. 2003). In *Mayes* the appellant argued that since he merely sought declaratory relief, sovereign immunity did not apply. *Id.* at 154. Holding instead that the "[a]ppellant's 'form of relief' argument [was] without merit" because "the nature of the relief sought is irrelevant to the question whether the suit is barred by sovereign immunity," the Tenth Circuit again declined to create an equitable or declaratory relief exception similar to that created by the Fifth Circuit. *Id.* at 155 (citation omitted).

{34}   In furtherance of its argument, Hamaatsa advocates for the rationale of a dissenting opinion by Justice Stevens in *Kiowa* claiming that the majority's opinion did not extend to a suit for equitable relief. *See Kiowa*, 523 U.S. at 763-64 (Stevens, J., dissenting). The Tenth Circuit rejected, upon remand, that very same argument after it was made by Justice Stevens in a concurring opinion in *Potawatomi I*, 498 U.S. at 515 (Stevens, J., concurring). *Potawatomi II*, 969 F.2d at 948 n.5. The Tenth Circuit stated that "[w]hile Justice Stevens suggested that 'a tribe's sovereign

immunity from actions seeking money damages does not necessarily extend to actions seeking equitable relief,' this view was not shared by any other member of the Court and was implicitly rejected [by] the majority . . . ." *Id*. (citation omitted). As such, the Tenth Circuit held that "to the extent [the appellant] asks us to adopt Justice Stevens' position, we reject it." *Id.*

{35} Hamaatsa additionally points to case law governing the inapposite doctrine of sovereign authority in support of an exception to tribal sovereign immunity for non-monetary relief. Citing *City of Sherrill, N.Y. v. Oneida Nation of N.Y.* (*Sherrill*), 544 U.S. 197 (2005), Hamaatsa argues that a claim against a tribe seeking equitable relief is available in spite of sovereign immunity. *Sherrill* does not stand for this proposition. *Sherrill* dealt with the sovereign authority of the Oneida Nation, in a suit brought by the Oneida Nation, as it relates to immunity from property taxation in the contexts of either reservation or fee-owned lands. *Id.* at 211 ("Because the parcels lie within the boundaries of the reservation originally occupied by the Oneidas, [the Oneida Indian Nation] maintained that the properties are exempt from taxation, and accordingly refused to pay the assessed property taxes."). Hamaatsa, in relying on the logic of a subsequent federal district court opinion, points to a cryptic footnote in *Sherrill* which it argues creates an exception to tribal sovereign immunity for

equitable relief. *See New York v. Shinnecock Indian Nation*, 523 F. Supp. 2d 185, 298 (E.D.N.Y. 2007), *vacated and remanded by* 686 F.3d 133. The *Sherrill* footnote reads "[t]he dissent suggests that, compatibly with today's decision, the [t]ribe may assert tax immunity defensively in the eviction proceeding initiated by Sherrill. . . . We disagree. The equitable cast of the relief sought remains the same whether asserted affirmatively or defensively." *Sherrill*, 544 U.S. at 214, n.7 (citation omitted). Yet, the saga of the *Sherrill* litigation did not end there—instead, following *Sherrill*'s order of remand, there were numerous opinions issued back and forth between the Second Circuit and the United States Supreme Court on the issues of sovereign authority and immunity that ultimately culminated in the United States Supreme Court ordering the Second Circuit, per curiam, to determine "whether tribal sovereign immunity from suit, to the extent it should continue to be recognized, bars taxing authorities from foreclosing to collect lawfully imposed property taxes." *Oneida III*, 562 U.S. at 42 (per curiam). In response, the Second Circuit determined that where the Oneida Nation

> had prevailed on the issue of tribal sovereign immunity from suit before both the district court and this Court, [it] now assures us, as it did the Supreme Court, that it will no longer invoke the doctrine of tribal sovereign immunity from suit as a basis for preventing the Counties from enforcing property taxes through tax sale or foreclosure.

27

*Oneida Indian Nation of N.Y. v. Madison Cty.* (*Oneida IV*), 665 F.3d 408, 425 (2d Cir. 2011). Thus, while recognizing that "[t]here may well be, as the Counties urge, remaining disagreements as to whether the [Oneida Indian Nation] possessed tribal sovereign immunity from suit at the time that these cases were before the district court and then on appeal to us in the first instance," the Second Circuit did not go as far as to confirm that the *Sherrill* footnote created an exception to sovereign immunity for non-monetary relief. *Oneida IV*, 665 F.3d at 425. The United States Supreme Court denied a petition for certiorari, ending the litigation relevant to the instant suit based on a waiver of—and not an exception to—sovereign immunity. *Oneida IV*, 665 F.3d 408, *cert denied*, 134 S. Ct. 1582 (2014). We conclude, given the relative weight of authority counseling against this exception—and the unequivocal command of the United States Supreme Court in *Kiowa* and *Bay Mills* that tribal sovereign immunity bars suit absent abrogation or waiver—the rationale of *Sherrill* is best confined to the doctrine of sovereign authority. *See, e.g.*, *Bay Mills*, 134 S. Ct. at 2031 ("[United States Supreme Court precedents] had established a broad principle, from which we thought it improper suddenly to start carving out exceptions. Rather, we opted to 'defer' to Congress about whether to abrogate tribal immunity for off-reservation commercial conduct." (citation omitted)). Thus, we choose not to recognize such an

28

exception in New Mexico at this time, as it is unsupported by federal law.

**iv.     Further Equitable Considerations**

{36}     Again, underlying the Court of Appeals reasoning in its majority opinion is an appeal to giving greater weight to "the practical effects of the application of sovereign immunity." *Hamaatsa*, 2013-NMCA-094, ¶ 15. As such, the Court of Appeals based its opinion in part on the equitable ground that the legal and practical effect of sovereign immunity in the instant dispute would be to deprive Hamaatsa of legal recourse. *See id.* ¶ 30 (Wechsler, J., dissenting). Sovereign immunity, though, is not discretionary—it is a threshold jurisdictional consideration. *See Puyallup Tribe, Inc. v. Dep't of Game of State of Wash.* (*Puyallup*), 433 U.S. 165, 172 (1977). No matter the equities of a given situation, sovereign immunity presents a pure jurisdictional bar to suit. *See Armijo*, 2011-NMCA-006, ¶ 13. In a case where tribal sovereign immunity is properly invoked, as a matter of federal law, that must be the end of all proceedings against a tribe. *See Puyallup*, 433 U.S. at 172. Unless and until Congress chooses to abrogate tribal sovereign immunity in the context of public road adjudication of this sort, we must respect the interests served by tribal sovereign immunity and order the suit be dismissed.

{37}     We commiserate with the less-than-ideal situation Hamaatsa now finds itself

29

in—and note that "[t]here are reasons to doubt the wisdom of perpetuating the doctrine." *Kiowa*, 523 U.S. at 758. Yet, venerable interests are served by adhering to the doctrine of tribal sovereign immunity. *See Ho-Chunk Nation*, 512 F.3d at 928 ("Tribal sovereign immunity is a necessary corollary to Indian sovereignty and self-governance[.]" (internal quotation marks and citation omitted)). And those interests have resulted in a doctrine that has persisted for over a century. *Bay Mills*, 134 S. Ct. at 2040 (Sotomayor, J., concurring). By virtue of maintaining tribal sovereignty Congress gives deference to the fact that tribes "have not given up their full sovereignty," thereby respecting the dignity of the place tribes occupy in our system of governance. *Id.* at 2040, 2042 (Sotomayor, J., concurring). Through immunity, the federal government also comes nearer to accomplishing its goal of "render[ing] tribes more self-sufficient, and better positioned to fund their own sovereign functions, rather than relying on federal funding." *Id.* at 2043 (Sotomayor, J., concurring) (citing 25 U.S.C. § 2702(1) (providing Congress' purpose for enacting the Indian Gaming Regulatory Act as creating "a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments")). The beneficial impact of tribal sovereign immunity in advancing the welfare and self-sufficiency of Indian tribes demands its application

in all cases where Congress does not otherwise provide.

**C.      Sovereign Immunity is Properly Raised by Motion to Dismiss**

{38}      The Court of Appeals reasoned that because the Pueblo admitted that the facts of Hamaatsa's allegations were true for the purposes of its motion to dismiss, a resolution of the Pueblo's tribal-sovereign-immunity defense was inequitable and improper at that stage of the proceedings. *See Hamaatsa*, 2013-NMCA-094, ¶ 10. We hold that the concessions made by the Pueblo for the purposes of filing its motion to dismiss are of no moment in the context of tribal sovereign immunity.

{39}      "Tribal sovereign immunity is a matter of subject matter jurisdiction which can be challenged in a Fed.R.Civ.P. 12(b)(1) motion to dismiss for lack of subject matter jurisdiction." *Bales v. Chickasaw Nation Indus.*, 606 F. Supp. 2d. 1299, 1301 (D.N.M. 2009); *see also Kiowa*, 523 U.S. at 754; *E.F.W. v. St. Stephen's Indian High School*, 264 F.3d 1297, 1302-03 (10th Cir. 2001); *Cash Advance & Preferred Cash Loans v. State*, 242 P.3d 1099, 1113 (Colo. 2010) (en banc) ("We conclude that tribal sovereign immunity bears a substantial enough likeness to subject matter jurisdiction to be treated as such for procedural purposes. Consequently, the tribal entities properly raised their claim of tribal sovereign immunity in a C.R.C.P. 12(b)(1) motion to dismiss for lack of subject matter jurisdiction."). We conclude the same logic holds

31

true in New Mexico's state courts, and that tribal sovereign immunity is properly raised in a Rule 1-012(B) motion to dismiss. *See Cash Advance & Preferred Cash Loans*, 242 P.3d at 1113 ("Our determination accords with the fact that, irrespective of whether all courts find that tribal sovereign immunity is precisely a question of subject matter jurisdiction, the claim is generally raised in a rule 12(b)(1) motion, pursuant either to federal or state rules of civil procedure."); *see also Kiowa*, 523 U.S. at 754; *Miner Elec., Inc. v. Muscogee (Creek) Nation*, 505 F.3d 1007, 1009 (10th Cir. 2007); *Allen v. Gold Country Casino*, 464 F.3d 1044, 1046 (9th Cir. 2006); *Garcia v. Akwesasne Hous. Auth.*, 268 F.3d 76, 84 (2d Cir. 2001); *Hagen v. Sisseton-Wahpeton Cmty. Coll.*, 205 F.3d 1040, 1043 (8th Cir. 2000); *Bales*, 606 F. Supp. 2d at 1301.

{40}    Rather than waiting until the later stages of litigation, the instant stage of the proceedings is the proper time, and a Rule 1-012(B) motion to dismiss the proper means, for asserting tribal sovereign immunity from suit. In fact, it is precisely the proper means necessary to ensure that the benefits of immunity are maintained. As a sovereign immune from suit, a tribe must be able to quickly and efficiently invoke the protections of sovereign immunity in order to avoid costly and time-consuming litigation. Tribal sovereign immunity from suit is more than a mere defense to

32

liability—it is immunity from *suit*, which is effectively lost if such a case is erroneously permitted to proceed through trial. *See Burlington N. & Santa Fe Ry. Co. v. Vaughn*, 509 F.3d 1085, 1090 (9th Cir. 2007). We conclude that the Pueblo properly raised its tribal sovereign immunity at this stage of the proceedings by Rule 1-012(B) motion to dismiss, and that the Court of Appeals erred in concluding otherwise.

**V.      CONCLUSION**

{41}     Unless and until Congress abrogates tribal immunity in relevant fashion our hands are tied by controlling federal law. It is not within the province of the New Mexico Supreme Court's authority to abridge the federal doctrine of tribal sovereign immunity. Because the Pueblo is immune from Hamaatsa's suit, we reverse the Court of Appeals and instruct the district court to enter an order dismissing Hamaatsa's suit.

{42}     **IT IS SO ORDERED.**

_____
**BARBARA J. VIGIL, Justice**

**WE CONCUR:**

_____
**CHARLES W. DANIELS, Chief Justice**

33

_____

**PETRA JIMENEZ MAES, Justice**


_____

**EDWARD L. CHÁVEZ, Justice**


_____

**JUDITH K. NAKAMURA, Justice**

34